[No. S055528. July 26, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LAMAR BARNWELL, Defendant and Appellant.

1040

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo, Assistant State Public Defender, Jessica K. McGuire and Carolyn R. Lange, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Catherine Okawa Kohm and Steven Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CORRIGAN, J.**—Lamar Barnwell was sentenced to death after a jury found him guilty of three counts of first degree murder and one count of second degree murder. The multiple murder convictions constituted the special circumstance required for imposition of the death penalty.[1] The jury found he personally used a firearm in committing the offenses.[2] This appeal is automatic.

We affirm the judgment as modified to reflect that defendant's sentence on the second degree murder count is 15 years to life in prison, not the sentence of life imprisonment without possibility of parole erroneously imposed. (See *post*, at p. 1048, fn. 7.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

Defendant's case is somewhat remarkable in that a policeman saw him shoot two of the murder victims. One night in 1992 Los Angeles Police Officers Brad Wise and Greg Smiley were on patrol. As they drove toward a tire shop, Officer Wise heard a shot. A woman screamed and another shot was fired. Wise ran up to a high fence surrounding the shop yard and looked through a hole in the gate. He saw defendant, some 20 to 25 feet away,

---

[1] Penal Code section 190.2, subdivision (a)(3). Statutory references are to the Penal Code unless otherwise indicated.

[2] Sections 1203.06, subdivision (a)(1)(A) and 12022.5, subdivision (a).

standing above two men lying facedown on the ground.[3] Defendant held a large-caliber, semiautomatic, blue steel pistol in his hand. The men were begging for their lives. Defendant bent down and put the pistol to the back of one man's head. Officer Wise heard two shots. Defendant then fired two more shots into the back of the other man's head.

Defendant ran, but the officers intercepted him as he emerged from another gate, still holding the pistol.[4] Officer Wise told defendant to drop the gun. Defendant protested, "It wasn't me." He ran back toward the gate, but then stopped and turned toward the officers. Wise thought defendant was going to shoot them, so he fired four shots at defendant.

Defendant ran back into the yard, where he was found by other officers. He had been shot three times. When his clothes were cut away by paramedics, a .45-caliber bullet fell out of his trousers. A .45-caliber semiautomatic pistol, a Colt Gold Cup model, was found on the ground inside the gate defendant had reentered. Expended cartridge casings found at the scene had been fired by the Colt.

In addition to the two men Officer Wise had seen defendant shoot, the bodies of a woman and another man were also found. All four victims had been shot in the head. Eural Johnson was the night watchman and Kenneth Newman was a friend of his. Jessie Dwight Bingham sometimes slept in a truck parked in the yard. Sandra Ann Green was his girlfriend. Bullets recovered from the bodies of Johnson and Green had been fired by the Colt. The record is silent as to whether slugs were recovered from Bingham and Newman.

Defendant waived his rights and spoke to the police. He said he had ridden a bicycle to the tire shop to sell cocaine to a man whose name he did not know. The victims were already on the ground when he arrived. As he left the scene he was confronted by the police. He put up his hands and said, "I didn't do it." He was shot by the police when he fled.

### 2. *Defense evidence*

Though they were called by the defense, the testimony of Felicia Rich and Deanna Nolan differed significantly from defendant's statement. They testified they were with defendant at a party that night. A tire on Rich's car was

---

[3] The scene was lit by streetlights and, inside the yard, by a large bonfire inside a barrel.

[4] There was no question in Officer Wise's mind as to whether it was the same man. He described the suspect as a Black male with bushy hair and a goatee, 25 to 30 years old, five feet eight inches to five feet nine inches tall, weighing 180 to 190 pounds, and wearing blue jeans and a dark blue sweatshirt with white writing on the front. The officer testified: "Everything is the same."

slashed, and defendant used his car to push hers to the tire shop. Defendant remained at the shop when Rich and Nolan left. As they drove away, Rich and Nolan heard shots. Neither of them saw defendant with a weapon that night.[5]

On rebuttal, Los Angeles Police Officer Vivian Flores testified that, a year before the murders, she had seen defendant pull a handgun from his waistband and lunge into the backseat of a parked car. Flores found a stainless steel, .45-caliber Colt Gold Cup model handgun in the backseat. The Colt Gold Cup model was a fairly expensive handgun, favored by sportsmen for target shooting. It had been in production for 30 years. There was no suggestion that the pistol found by Officer Flores was the weapon involved in this case, which had a blue steel finish.

### B. *Penalty Phase*

#### 1. *Prosecution evidence*

The prosecution introduced evidence that in the four years preceding this trial defendant had committed two murders, an assault and robbery, and another assault. None of these crimes had been previously adjudicated.

#### a. *The murder of Samuel Graham*

The morning of September 1, 1988, in an area of Los Angeles County then given over to horse stables, Samuel Graham was found dead from multiple gunshot wounds. Earlier that morning a woman who spent the night at one of the stables heard what may have been the shots and, seconds later, the screeching of tires. According to prosecution witnesses, defendant abducted Graham, apparently twice, the day before he was murdered.

Dean Drake testified that on the afternoon of August 31, he and Graham were standing on a sidewalk in Oceanside talking when a white truck pulled up. Defendant jumped out and ordered Graham to accompany him. When Graham did not respond, defendant struck him hard in the face with a jacket. Frightened, Graham put his head down and got into the truck with defendant and the driver, a Black man with a bald head.[6] That was the last time Drake saw Graham alive. Evidence established that Drake suffered from substantially diminished intelligence and a faulty memory. He admitted he was a drug dealer and repeatedly contradicted himself during his testimony.

---

[5] In his statement defendant said nothing about a party, Rich, Nolan, or a slashed tire.

[6] Drake was also frightened of defendant. Defendant had once broken his nose, to force him to join defendant's gang. On another occasion defendant had shot him in the leg for no apparent reason.

Carol Leonard testified that in the early evening of August 31, she spoke to Graham at an Oceanside convenience store. Defendant and a bald-headed Black man were standing at the door. Graham was almost in tears and could barely talk. He told Leonard, "They're gonna kill me." The two men walked Graham out of the store and drove off with him in a white truck. Leonard never saw Graham alive again.

### b. *The murder of Johnnie Cox*

One evening in July 1989, James Rankins was in Stockton, sitting on a park bench with his friend Johnnie Cox. Rankins was a member of the Conway Crips gang; Cox was not a gang member. They were accosted by defendant and several other members of the L.A. Boys gang. One of the L.A. Boys hit Cox. As Cox fled, defendant shot him. Rankins was under the influence of drugs at the time. However, "it didn't stop me from seeing what was going on. I was alert." There was no doubt in his mind that defendant was the man who shot Cox. Rankins admitted he had been interviewed by the police on several occasions before the trial and had denied knowing who shot Cox.

Tina Coit was in the Stockton park and saw defendant shoot a man running from him. Coit admitted she was "pretty loaded" on crack cocaine when the shooting occurred. Questioned at the time, she told police she did not witness the shooting. She initially maintained that story when questioned by the officers preparing for this prosecution. When told they would inform her parole officer if she did not cooperate, she agreed to talk to them. They showed her an album and repeatedly pointed at defendant's photograph, saying, "That's him, isn't it?" At trial, Coit maintained that her testimony was not affected by concern over her previous parole status.

A pathologist testified that Cox died of gunshot wounds, one of which was consistent with his having been shot while running away from his assailant.

### c. *The assault on Hattie Louise Heath*

Heath had known defendant for a long time; he and her son had been good friends since elementary school. In 1987, she purchased rock cocaine from him and, despite his repeated demands, failed to pay him $5 of the purchase price. Encountering defendant on the street, Heath fled. When she took refuge in an apartment building, he shot at her twice through the door. He also shot a man who tried to assist her. Heath identified defendant to the police, but later dropped the charges because she feared for her life.

### d. *The robbery and assault of Michael Oliver*

Oliver was a rock cocaine dealer in Stockton. One evening in 1991, three men assaulted him, demanding drugs and money. The lower half of one man's face was covered by a cloth. Nevertheless, Oliver knew defendant and recognized him by sight and by his distinctive voice. The men took Oliver's money and jewelry. Defendant beat him with a pistol and shot him in the arm. Because defendant had a reputation as a killer, Oliver did not identify him to the police.

### 2. *Defense evidence*

Defendant's paternal grandmother, Bertha Barnwell, testified that defendant was born out of wedlock. His mother Susan was 16 and his father James was 20. Although they later married, James had numerous affairs and abandoned his family when defendant was six. Susan abused drugs and alcohol. She stabbed James and another boyfriend. One weekend, when defendant was 15, Susan brought him to Ms. Barnwell's house and said she would be back on Monday. Three months later her body was found in a deserted building. Always a quiet child, after his mother's death defendant became even more withdrawn. His grades suffered. During the two or three years he lived with Ms. Barnwell defendant had no troubles with the law.

Defendant's maternal grandmother, Ola Pork, described him as a good child who "didn't smoke, didn't drink, didn't run the streets." He was a good father to his six children.

Defendant's father, James Lamar Barnwell, was allowed to testify although he reeked of alcohol. Mr. Barnwell testified that he began selling drugs when he was 12 or 13 to support his mother Bertha. He was incarcerated in Soledad State Penitentiary when defendant was born. When defendant was 12 or 13, Mr. Barnwell abandoned his family and fled to Georgia because he had violated the terms of his California probation.

Defendant's paternal aunt, Margaret Benita Robinson, testified that defendant's father was an alcoholic all of defendant's life. Defendant's mother also abused drugs and alcohol, even when she was pregnant. Defendant's parents fought, sometimes physically. Angered over one of her husband's affairs, defendant's mother cut up all of his clothes. She was sometimes incarcerated when her children were small.

Another paternal aunt, Clementene Adams, described defendant's father as an ineffective parent who abused alcohol. Defendant's mother also drank and used drugs. Once, when defendant was 10, he had to drive her home because she was so intoxicated. Defendant was a quiet, withdrawn child.

The mother of defendant's two sons said he was a good father who saw his children on a daily basis before he was arrested. A former neighbor who had known defendant since he was a child, described him as an "all around good guy" who was always respectful. A childhood friend said defendant was a nice person who was close to her children and helpful to neighbors.

Clyde Terry, a deputy sheriff in charge of defendant's jail module, testified that his dealings with defendant were always positive. Defendant told Deputy Terry he was a member of the Main Street Crips. Loy McBride, another deputy assigned to the jail, had known defendant for two years and found him quiet and polite.

Dr. William Vicary, a psychiatrist, interviewed defendant for seven hours. He also reviewed reports of the interviews defense investigators conducted with defendant's family members, defendant's school and medical records, and the police reports of this case and of defendant's prior unadjudicated offenses. Dr. Vicary concluded that defendant reacted to his traumatic childhood by treating his gang as a family. Defendant's school records indicated difficulty with attention and concentration, poor self-control, hyperactivity, and poor memory. He was thought to have a learning disability and his IQ tested in the borderline range of mental retardation. His hyperactivity was untreated. However, based on his own evaluation, Dr. Vicary concluded that defendant was sane, competent to stand trial, of average intelligence, and not psychotic. He had no brain damage.

On cross-examination, Dr. Vicary expressed the opinion that if defendant "was still on the streets, there would probably be more dead bodies." Defendant was also involved in "serious fights" while in jail. As a gang member, he could become a "real threat" in prison. "He could get involved in the drug trafficking . . . and extortions . . . and homicides that take place in prison." Defendant had never expressed any remorse for these crimes or for any of his other crimes.

C. *Judgment*

The jury found defendant guilty of the first degree murders of Eural Johnson, Kenneth Newman, and Sandra Ann Green, as well as the second degree murder of Jesse Dwight Bingham. The trial court sentenced him to death on the first degree murder counts and to life imprisonment without

possibility of parole on the second degree murder count. As the People concede, the second degree murder sentence is error.[7] We affirm the judgment as to the first degree murder counts, but modify it as to the second degree murder count to reflect the fact that the correct sentence for that count is a state prison term of 15 years to life.

## II. DISCUSSION

### A. *Discharge of Juror R.D.*

The trial court discharged Juror R.D. for failing to deliberate. Specifically, it found his refusal to deliberate was "based upon his disbelief of police officers' testimony." Accordingly, our review is focused on the question whether the record demonstrates[8] that Juror R.D. exhibited a general bias against police officers that prevented him from fairly weighing police testimony in this case.

On the second day of deliberations, the jury sent two notes to the court stating that "[w]e need assistance in deliberating" and that "this one juror is not deliberating as [he] should be." In response, the court reread CALJIC No. 17.40 on the duty to deliberate. Juror R.D. identified himself as the subject of the jury's notes. In a sidebar conversation, he denied he had refused to deliberate and promised he would follow the court's instructions. The court directed the jury to resume deliberations.

After lunch the jury sent out another note to the court stating that the problem juror seemed to have a bias against law enforcement officers. It read in pertinent part: "Since [the beginning of deliberations] we have been trying to reason and discuss the situation [but] to no avail. Now we're at a standstill and don't know what to do. There was a question asked to [Juror R.D.] about whether or not he believes what Sgt. Montgomery or Sgt. Woodhead said, and the response was would you believe them, their [*sic*] going to back up what the other cops say, so it seems to be some bias against the cops. We ask the juror if he is willing to deliberate. He said 'yes, but I will never change my opinion.' "

---

[7] Defendant filed a supplemental brief arguing that the judgment should be modified to reflect that his sentence on the second degree murder count (count IV) is 15 years to life. Subject to certain exceptions not applicable here, that is the sentence provided for second degree murder. (§ 190, subd. (a).) A claim that a sentence is unauthorized may be raised for the first time on appeal, and is subject to correction whenever the error comes to the attention of the reviewing court. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [66 Cal.Rptr.2d 423, 941 P.2d 56].)

[8] See the discussion of the appropriate standard of review *post*, at pages 1052–1053.

In response to this third note, the court conducted a hearing and took testimony from all 12 jurors. Juror R.D. claimed he was not biased against all law enforcement officers, but simply disbelieved the officers in this case. However, nine of the 11 other jurors testified that R.D. had expressed or exhibited a general bias against law enforcement officers. The testimony of the remaining two jurors was inconclusive.

Juror R.D. testified, "it's not all the police officers that I have a concern with. It's just a few, and I think [they] are the relevant ones in the case. And I don't consider their testimony." The court asked R.D. whether there had been any discussion among the jurors "about disbelieving police officers' testimony simply because they are police officers." R.D. responded, "Yes. Two people, I believe, feel that that's my problem, but that's absolutely not true."

Jurors C.T., M.B., R.W., and S.C. contradicted R.D.'s assertions. They specifically quoted statements by R.D. expressing a bias against police officer testimony.[9] According to C.T., R.D. had made up his mind before deliberations began and when the other jurors tried to discuss the case with him, R.D. stated that nothing anyone could say would change his mind. That prompted the jury to send its first note to the court. When the court again instructed the jury on the duty to deliberate, "[W]e came to another problem. He stated that he feels that *all* law enforcement will *always* back each other up regardless of [whether] it is right or wrong. . . . *All* law enforcement will back each other up. And he will not change that. He says that all witnesses that have been brought to the stand . . . that are involved in law enforcement in any way have lied." (Italics added.) The other jurors appealed to R.D. to consider "all evidence, not just the fact that law enforcement is involved." R.D. responded, "I don't care. I can sit here all day, and there's nothing, nothing that anybody could say. Law enforcement lies."

Juror R.W. testified: "We have one gentleman who says he has . . . an open mind towards deliberation but really does not. He's convinced that . . . a policeman has lied, and there was a conspiracy to maintain that aspect of things. He thinks that all, all policemen lie, and that's what's been said." The court asked R.W. whether R.D. had conveyed to the other members of the jury a belief that all policemen lie. R.W. responded, "That was what came out of his mouth at one point."

The court had the following colloquy with Juror M.B. "The Court: Is there any aspect of the evidence or testimony that this jur[or] appears to be dogmatic in? [¶] [M.B.]: Yes. [¶] The Court: And what type of testimony is

---

[9] R.D.'s fellow jurors did not mention him by name. However, as we have stated, R.D. identified himself as the juror of concern.

that? [¶] [M.B.]: Well, it's like he's got a thing against cops. He's very negative toward them. [¶] The Court: Okay. What do you mean by 'very negative.' [¶] [M.B.]: Well, I asked him a question. I said do you believe the testimony of two of the sergeant[s]. He was, like, 'Would you believe them? They are there to back up the other cops.' So I feel that's a dead-end situation."

Juror S.C. was the foreperson. According to S.C., R.D. was "prejudiced" against the Los Angeles Police Department. The court inquired whether that was what R.D. had said. S.C. responded, "Not in those words but close." The court asked what words R.D. did use. S.C. replied, "If one does something wrong that they will all back him up." The colloquy continued. "The Court: I notice in your statement it says, 'There was a question asked to the same juror about whether or not he believes what Sergeant Montgomery or Sergeant Woodhead said,' and the response was 'Would you believe them? They are going to back up what the other cops say.' So it seems to be some bias against the cops? [¶] [S.C.]: Yes."

The other five jurors whose testimony supported the trial court's finding of bias did not quote Juror R.D. directly, but instead summarized his attitude toward police officer testimony based on their observations of his behavior. Juror M.L. testified that R.D. seemed to have a "bias against the Los Angeles Police Department, and that's about it." Juror M.V. reported that R.D. "just flat out has disbelief in police." Juror S.G. told the court that R.D. seemed to have "a bias towards police officers." "He hasn't said it directly, but in a roundabout way that's the impression that I'm getting." Juror S.H. stated, "I have an impression that [R.D.] has some biases towards law enforcement, but . . . that's just an impression." According to Juror R.M., R.D. was "close[]-minded" toward police officer testimony. On the other hand, R.D. did discuss the evidence with the other jurors and he disbelieved defense as well as prosecution witnesses.

The remaining jurors were A.B. and M.F. Juror A.B. reported that R.D. said he did not believe the officers' testimony in this case, that they were liars. However, she did not characterize Juror R.D.'s attitude as a general bias against police officer testimony. "The Court: Did [R.D.] indicate to you that he wouldn't believe any of the police officers? [¶] [A.B.]: No. [¶] The Court: So he just didn't believe what the police officers were saying. [¶] [A.B.] That's right. Or what they said as far as this case was concern[ed]." Juror M.F. was asked by the court whether any of the jurors indicated they would not believe police officer testimony. M.F.'s response was not a model of clarity, but it could not be fairly characterized as affirmative. His answer was as follows: "Um, it would be, like, somewhat like that. But to actually say that for every part of—for every part of everyday life, they wouldn't say that. But in some cases they would."

After the hearing and after receiving the arguments of counsel, the court excused R.D. "[I]n my opinion, . . . in deliberating this one juror, [R.D.], is not following the court's instructions. I feel that his lack of participation is based upon his disbelief of police officers' testimony."

Defendant contends the discharge was without good cause, violating his right to a jury trial under the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution, as well as his right to due process of law under the Fourteenth Amendment to the United States Constitution.

The contention fails on this record.

When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. (*People v. Burgener* (2003) 29 Cal.4th 833, 878 [129 Cal.Rptr.2d 747, 62 P.3d 1] (*Burgener*); *People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225] (*Cleveland*).)

A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge. (*People v. Ayala* (2000) 24 Cal.4th 243, 272 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Nesler* (1997) 16 Cal.4th 561, 581 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn.).) Specifically, a bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement. (*People v. Feagin* (1995) 34 Cal.App.4th 1427, 1437 [40 Cal.Rptr.2d 918]; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [267 Cal.Rptr. 865] (*Thomas*); see *Nesler*, at p. 588 [citing *Thomas* with approval].) Bias may be established by the testimony of other jurors. (*Ayala*, at p. 272; *Nesler*, at p. 581.)

A distinction must be made, of course, between a juror who cannot fairly deliberate because of bias and one who, in good faith, disagrees with the others and holds his or her ground. "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. [Citation.]" (*Cleveland, supra,* 25 Cal.4th at p. 485.)

■ Removing a juror is, of course, a serious matter, implicating the constitutional protections defendant invokes. While a trial court has broad discretion to remove a juror for cause,[10] it should exercise that discretion with great care.

■ We have given two different formulations of the applicable standard on review. On the one hand, we have stated that a court's decision to remove a juror is to be upheld if supported by "substantial evidence." (See, e.g., *People v. Williams* (2001) 25 Cal.4th 441, 448 [106 Cal.Rptr.2d 295, 21 P.3d 1209].) "Substantial evidence" has been characterized as a "deferential" standard. (See, e.g., *People v. Carter* (2005) 36 Cal.4th 1114, 1140 [32 Cal.Rptr.3d 759, 117 P.3d 476].)[11] On the other hand, we have stated, often in the same opinion, that a juror's disqualification must appear on the record as a " ' " 'demonstrable reality.' " ' " (*Cleveland, supra,* 25 Cal.4th at p. 474; see *People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; see also *Boyette, supra,* 29 Cal.4th 381.) The demonstrable reality standard traces back to Justice Mosk's majority opinion in *People v. Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537]. This standard "indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror." (*Cleveland, supra,* at p. 488 (conc. opn. of Werdegar, J.).)

To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.

■ A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. (See *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.

■ The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias

---

[10] See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 462, footnote 19 [127 Cal.Rptr.2d 544, 58 P.3d 391] (*Boyette*).

[11] "Although 'substantial' evidence is not synonymous with 'any' evidence . . . , the standard is easily satisfied." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 363, p. 413.)

was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.

In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides. A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion that a juror was failing to follow the oath. In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality.

■ The evidence bearing on the question whether a juror has exhibited a disqualifying bias during deliberations may be in conflict. Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it. (See, e.g., *Thomas, supra*, 218 Cal.App.3d 1477, 1482–1485 [bias against police officers].) In such a case the trial court must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony. The trial court may also draw upon the observations it has made of the jurors during voir dire and the trial itself. Naturally, in such circumstances, we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal.

■ Here, the trial court stated its reason for removing Juror R.D.: "disbelief of police officers' testimony." The court did not expressly state that it did not believe R.D.'s disclaimer of a general bias preventing him from fairly weighing the testimony of the officers in this case. However, the clear thrust of the court's ruling is that it did find the testimony of the nine jurors who stated that R.D. expressed or exhibited such a bias to be credible, and based its decision on that finding. Based on this record we are satisfied that R.D.'s disqualifying bias was established to a "demonstrable reality." The totality of the evidence here supports the trial court's evident conclusion that, more than simply disbelieving the testimony as given by these particular witnesses, R.D. judged their testimony by a different standard because the witnesses were police officers. Applying such different standards to the evaluation of different witnesses is, of course, contrary to the court's instructions and violative of the juror's oath of impartiality. (See, e.g., Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 105, Witnesses.)

Finally, defendant contends that the court's inquiry into R.D.'s alleged bias unnecessarily intruded upon the sanctity of the jury's deliberations, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

 "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Cleveland, supra,* 25 Cal.4th at p. 485.)

The inquiry here was appropriately limited. The final note from the jury raised the concern of bias against police officer testimony. It bears repeating that the court was *required* to conduct a hearing to resolve that concern. (*Burgener, supra,* 29 Cal.4th at p. 878; *Cleveland, supra,* 25 Cal.4th at p. 478.) The first juror called was C.T. The court admonished her: "Miss [T.], we received questions from the jury panel regarding the deliberative process. Now, be very careful, and do not volunteer any information about the determination of guilt or innocence in this case. That's not why you're here. What the court is trying to find out is what is the problem as far as deliberation in this case."[12] Without further questions from the court, C.T. testified that R.D. had directly expressed a general bias against police officer testimony: " 'Law enforcement lies.' " Given C.T.'s testimony, the court was clearly required to examine the other jurors. As it did so, it focused narrowly on the matter at issue. We find no error.

B. *Application of* People v. Engelman

In *People v. Engelman* (2002) 28 Cal.4th 436 [121 Cal.Rptr.2d 862, 49 P.3d 209] (*Engelman*), this court considered "whether trial courts should advise juries in the terms of CALJIC No. 17.41.1, a recently drafted pattern jury instruction given in criminal cases. This instruction informs jurors at the outset of jury deliberations that 'should . . . any juror refuse[] to deliberate or express[] an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.' (CALJIC No. 17.41.1 (1998 new) (6th ed. 1996).)" (*Engelman,* at p. 439.)

---

[12] The court gave much the same admonition to the other jurors.

We concluded that "the instruction does not infringe upon defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict," and upheld the Court of Appeal's decision affirming the judgment of conviction. (*Engelman, supra,* 28 Cal.4th at pp. 439–440.) However, in the exercise of our supervisory power, we directed that the instruction not be given in future trials. (*Id.* at p. 449.) "Although jurors have no right to refuse to deliberate or to disregard the law in reaching their decision, we believe the instruction has the potential to intrude unnecessarily on the deliberative process and affect it adversely—both with respect to the freedom of jurors to express their differing views during deliberations, and the proper receptivity they should accord the views of their fellow jurors." (*Id.* at p. 440.)

Because this trial occurred before CALJIC No. 17.41.1 was adopted, it was not given here. However, defendant contends that remarks made by the court and prosecutor during voir dire were objectionable on the same grounds.

During voir dire, while instructing the prospective jurors on their duty to deliberate, the court asked one panel: "Now, if such a thing were to happen that a juror refused to deliberate, would you be strong [enough] to remind that juror that they were violating their oath?" The jurors answered yes. The court continued: "Would you be strong enough to bring it to my attention if that behavior persisted?" The jurors again answered yes. Essentially the same exchange occurred with another panel. In his voir dire, the prosecutor gave examples of juror misconduct, such as discussing the case with a nonjuror, and asked some of the prospective jurors whether they would bring such misconduct to the attention of the court.

As we made clear in *Engelman,* even the giving of a formal jury instruction on these topics would not have infringed upon defendant's federal or state constitutional rights to trial by jury or his state constitutional right to a unanimous verdict. (*Engelman, supra,* 28 Cal.4th at pp. 439–440.) Moreover, the remarks made by the court and prosecutor did not invite the jurors to act as though they had "a license to scrutinize other jurors for some ill-defined misconduct rather than to remain receptive to the views of others." (*Id.* at p. 447.)

### C. *Defendant's Earlier Handgun Possession*

On rebuttal, and over the objection of defendant, the trial court admitted the testimony of Officer Vivian Flores, which tended to show that a year before the murders defendant possessed another handgun similar to the murder weapon. (*Ante,* at p. 1044.)

The trial court ruled that Officer Flores's testimony was relevant to defendant's *identity* as the murderer because the "relatively unique" characteristics of the pistol she found in his possession demonstrated his "*propensity* to own or carry that type of weapon." (Italics added.) The court concluded that the probative value of the evidence outweighed any resulting prejudice.

 When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. (*People v. Cox* (2003) 30 Cal.4th 916, 956 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1].) Because the prosecution did not claim the weapon found by Officer Flores was the murder weapon, its admission was error.

 Moreover, as defendant correctly contends, the trial court erred under Evidence Code section 1101 in two respects. First, under section 1101, subdivision (a), "propensity" evidence is generally inadmissible.[13] Second, Officer Flores's testimony was also inadmissible under section 1101, subdivision (b).[14]

 To be admissible on the issue of identity, an uncharged crime must be highly similar to the charged offenses, so similar as to serve as a signature or fingerprint. (*People v. Gray* (2005) 37 Cal.4th 168, 203 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Kipp* (1998) 18 Cal.4th 349, 369–370 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

 Defendant's previous possession of a weapon, even of a similar weapon, is not so distinctive on these facts as to serve as a signature or a fingerprint supporting a conclusion that because he had committed the earlier

---

[13] Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[14] Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

offense he must have committed the one for which he was on trial. We also note that even evidence properly admitted under Evidence Code section 1101, subdivision (b) cannot be relied upon to prove propensity or disposition.

Defendant contends the erroneous admission of Officer Flores's testimony denied him due process under the Fifth and Fourteenth Amendments and undermined his right to reliable guilt and penalty determinations under the Eighth Amendment to the federal Constitution. However, admission of the testimony was clearly harmless beyond a reasonable doubt. (See *People v. Hughes* (2002) 27 Cal.4th 287, 333 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Here, Officer Wise *saw* defendant shoot two of the victims. Wise precisely described defendant and the .45-caliber pistol he used. Defendant was still holding the pistol when he ran out of the gate. Thereafter, a .45-caliber bullet was found in defendant's pocket, the pistol was found nearby, and the bullets recovered from the victims' bodies had been fired from it. (*Ante*, at p. 1043.)

### D. *Consciousness of Guilt Instruction*

Defendant's statement to the police and the story he presented at trial through his witnesses Rich and Nolan gave two entirely different accounts of why he went to the crime scene, how he got there, and what he found when he arrived. Defendant told the police he had ridden a bicycle to the tire shop to sell rock cocaine to some unnamed person. The gate was open and the victims were on the ground when he arrived. However, Rich and Nolan testified defendant had used his car to push Rich's car to the shop to repair a slashed tire. The locked gate was opened by an employee, who fixed Rich's tire.

In light of these discrepancies, the court instructed the jury, over defendant's objection, that it could consider any false statements made by defendant as evidence of his consciousness of guilt of the charged offenses, although such conduct alone is insufficient to prove guilt, and its weight and significance, if any, are matters for the jury. (See CALJIC No. 2.03.)

Defendant contends the instruction was impermissibly argumentative and encouraged the jury to make an irrational inference, thereby violating his federal and state constitutional rights to due process, a jury trial before a properly instructed jury, and a fair and reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.) The instruction was properly given here. The jury could rationally infer that defendant made a false statement to deflect suspicion from himself. (*People v. Rankin* (1992) 9 Cal.App.4th 430, 436 [11 Cal.Rptr.2d 735].) We have repeatedly rejected arguments attacking the instruction (*People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190] & cases cited) and defendant offers no persuasive reason to reconsider our views.

### E. *Prior Unadjudicated Offenses*

Contrary to defendant's assertions, introduction of evidence concerning his unadjudicated offenses (*ante*, at pp. 1044–1046), under section 190.3, factor (b), did not offend the federal Constitution. (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614]; *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968] (*Elliot*); *People v. Barnett* (1998) 17 Cal.4th 1044, 1178 [74 Cal.Rptr.2d 121, 954 P.2d 384].) The expiration of the statute of limitations for some of the unadjudicated offenses affected the weight of the evidence, not its admissibility. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1088 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Medina* (1995) 11 Cal.4th 694, 772 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1161 [36 Cal.Rptr.2d 235, 885 P.2d 1].) *Johnson v. Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] is inapposite.[15]

### F. *Constitutionality of California's Death Penalty Statute*

Defendant mounts a number of challenges to California's death penalty statute that we have often considered and repeatedly rejected. Our views remain the same.

The death penalty law adequately narrows the class of death-eligible offenders. (See, e.g., *People v. Dickey* (2005) 35 Cal.4th 884, 931 [28 Cal.Rptr.3d 647, 111 P.3d 921] (*Dickey*).)

Consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty. (See, e.g., *People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).)

The death penalty is not unconstitutional for failing to impose a specific burden of proof as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the

---

[15] "Defendant cites *Johnson v. Mississippi*[, *supra*,] 486 U.S. 578 . . . as holding that the procedures for considering aggravating evidence of other crimes must conform in all respects to the constitutional standards governing proof of charged offenses. But *Johnson* does not so hold. In that decision, the high court reversed a death judgment because the prosecution had been allowed to prove a prior conviction with nothing more than the record of a judgment that had been reversed on appeal; 'the prosecutor did not introduce any evidence concerning the alleged assault itself . . . .' (*Johnson v. Mississippi*, *supra*, at p. 585.) Here, in contrast, the People did not seek to prove a prior conviction for rape. Instead, they merely proved other violent criminal conduct by defendant (§ 190.3, factor (b)) through properly admitted evidence. About this, *Johnson* has nothing to say." (*People v. Yeoman* (2003) 31 Cal.4th 93, 137–138 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

appropriateness of a death sentence. (See, e.g., *Brown, supra,* 33 Cal.4th 382, 401.) Nor do the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] alter this conclusion, either with respect to the existence of an aggravating factor or as to the determination whether aggravating factors outweigh mitigating factors. (See, e.g., *People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes). (See, e.g., *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Intercase proportionality review is not constitutionally required. (*Dickey, supra,* 35 Cal.4th at p. 931.)

A penalty phase jury may consider prior unadjudicated criminal conduct under section 190.3, factor (b), and the jury need not make a unanimous finding that the defendant was guilty of the unadjudicated crimes. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

Section 190.3's use of adjectives such as "extreme" (*id.,* factors (d), (g)) and "substantial" (*id.,* factor (g)) in describing mitigating circumstances does not impermissibly limit consideration of such factors. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

A penalty phase jury need not be instructed that section 190.3, factors (d), (e), (f), (g), (h), and (j) can only mitigate, and not aggravate, the crime. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

The death penalty law does not deny capital defendants equal protection because it provides a different method of determining the sentence than is used in noncapital cases. (See, e.g., *People v. Smith* (2005) 35 Cal.4th 334, 374 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

## III. DISPOSITION

We affirm the judgment as modified to reflect that defendant's sentence on count IV is imprisonment for 15 years to life.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 19, 2007.