Filed 11/16/22  P. v. Rivera CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095003 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE004184) |
| v. | |
| DANTE DAVE RIVERA, | |
| Defendant and Appellant. | |

A jury found defendant Dante Dave Rivera guilty of one count of rape and two counts of digital penetration.  The trial court sentenced defendant to six years in state prison.

On appeal, defendant raises two claims.  First, he contends the trial court erred in removing the lone holdout juror, who did not disclose her son was once threatened by a similar accusation during jury selection.  Second, he argues the People failed to present sufficient evidence to prove beyond a reasonable doubt that defendant digitally

1

penetrated the victim more than once.  We disagree with both contentions and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The victim, M.D., attended a party at defendant's mother's house on the night of February 15, 2018.  M.D. took prescription medicine, pain killers, and cocaine prior to the party, and consumed hard alcohol at the party.

Towards the end of the night, M.D. became concerned that she was too intoxicated to drive home safely and decided to take a nap in the house to sober up.  She asked defendant, then 22 years old, if she could nap in the house; defendant agreed and suggested M.D. sleep in his bed.  M.D. complied.  She followed defendant into his room, laid on top of the covers of his bed with her clothes on, and fell asleep.

M.D. awoke to defendant taking her pants off.  She had had no prior discussion with defendant about any type of sexual conduct and had no desire for sexual engagement with defendant.  Nevertheless, defendant inserted his finger into M.D.'s vagina over her protest.  He then forced M.D.'s legs apart and put his penis inside her vagina even though she repeatedly said no.  Defendant eventually stopped and fell asleep next to M.D.  After defendant fell asleep, M.D. gathered her belongings and left the house.

After leaving the house, M.D. headed to a hospital where a sexual assault examination was done, and a sexual assault evidence collection kit was prepared.

The jury found defendant guilty of one count of rape (Pen. Code, § 261, subd. (a)(2)); statutory section citations that follow are found in the Penal Code unless otherwise stated) and two counts of digital penetration (§ 289, subd. (a)(1)).  The trial court sentenced defendant to six years in state prison.  Defendant timely appealed.

2

DISCUSSION

I

*Removal of Juror No. 10*

Defendant contends the trial court erred in removing Juror No. 10 based on her failure to disclose during jury selection a similar accusation made against her son, arguing her son's incident did not impair her ability to deliberate.

A.    Additional Background

During the two-day voir dire, both the prosecutor and defense counsel repeatedly informed the prospective jurors that this was a sexual assault case.  Defense counsel asked prospective jurors if any of them "know[s] anyone . . . who has been accused of inappropriate sexual conduct or sexual harassment."  Only one prospective juror responded affirmatively, and he was ultimately excused.  When asked about their positions with regard to the victim rights organization such as the Me Too Movement, a prospective juror admitted she was a survivor of sexual assault, as well as several of her friends.  This prospective juror was also excused.  The prosecutor later stated the law allows conviction of a sexual assault crime to be based on the testimony of the alleged victim alone and asked if any prospective jurors were uncomfortable with the standard.  Several prospective jurors stated they needed to hear more evidence, but Juror No. 10 did not join in.

Following these discussions, the trial court started asking questions of Juror No. 10.  She stated she had worked as a legal secretary and a paralegal for two decades handling civil sexual assault cases on behalf of school districts.  She had no "thoughts or feelings about the nature of the charges in this case that cause [her] pause about serving as a juror."  When asked about the "criminal experience" in her family, Juror No. 10 responded her brother-in-law was arrested for driving under the influence.  Finally, the

court asked Juror No. 10 if there was "anything you think is important for us to know about your ability to serve as a juror," and Juror No. 10 answered, "No."

On the second day of jury deliberations, the jury foreperson alerted the trial court that Juror No. 10 disclosed her son was once threatened with a rape accusation. According to the foreperson: "[Juror No. 10] disclosed that she had particular concerns and feelings because of her own son having had a similar accusation against him from a former girlfriend, and she had discussed the accusation with police and apparently it did not rise to a prosecution or anything like that, but it was concerning to her, and it provided her some personal concerns that affected her ability to consider the case impartially."

The trial court then questioned Juror No. 10. Juror No. 10 admitted her son was once threatened by an ex-girlfriend, when he was 18 years old, and that she would tell the police he committed statutory rape. At the time, Juror No. 10 "instantly dealt with" the threat "based on [her] knowledge of how to do things." She contacted the police department, asked them how to handle the issue if "something happens," and the police "addressed it with" her. But no charges were ever filed against her son.

As to the circumstances surrounding the disclosure of her son's incident, Juror No. 10 stated she was "the last one to hold [her] ground" and "there's a lot of irritation because of it." The trial court asked her: "Do you think it was pressure that you were feeling that . . . bubbled this up to make you disclose?" Juror No. 10 responded: "Yes." The court then asked if Juror No. 10 attempted to explain her holdout to other jurors using her son's incident: "Maybe this is why I feel this way, this is what can happen because this is what happened to my son?" Juror No. 10 agreed: "I think that it caused it to come out, yes." She later reiterated: "I'm a little upset because I do feel because I am the person with the doubt that I am being pushed and pressured, and that is why I brought up this, you know, I've had personal experience with this, but I haven't to an extent."

4

But she denied her son's "situation ha[d] anything to do with the way [she] perceive[d] this case, because [she] looked at the facts and looked at all the statements."

The trial court stated it was concerned that Juror No. 10 did not disclose her son's situation during voir dire, noting "this is something that would have been very important [*sic*] everybody to know when we were picking a jury." Juror No. 10 apologized, claiming "[i]t did not come to mind" when she was asked. She just "totally did not even put that in [her] head." The prosecutor asked Juror No. 10: "In retrospect given the subject matter of a young man that was around the same age as your son that's accused of rape, would you acknowledge this maybe wasn't the best case for you?" Juror No. 10 agreed but insisted her son's situation had nothing to do with "the way [she] perceive[d] this case."

Defense counsel asked Juror No. 10 whether she believed she could continue to deliberate with other jurors based on the pressure she described. Juror No. 10 responded "personally" she could "sit there and take it," but she was not sure if other jurors could continue the deliberation with her because she had "dug [her] heals [*sic*] in, and the heals [*sic*] are probably going to stay there and not going to be happy and not moving along." Nevertheless, she was "willing to go in there and do the job [she] was asked to do."

During the examination, Juror No. 10 also stated several times that she was willing to "step aside." The prosecutor later noted she "[c]learly heightened her voice" when she asked to step aside, arguing her emotional state threatened her ability to deliberate.

After the questioning, the trial court decided to excuse Juror No. 10. It noted Juror No. 10 "did not disclose something that's incredibly relevant to the issues in this case, incredibly relevant to a determination of whether or not she would be excused for cause that her young son was close to—accused or threatened to be accused of rape, which is the same charges here against another young man." The incident relating to her son, the court observed, likely caused her to be the holdout juror. Specifically, the court recounted Juror No. 10's admission that her feelings about her son "bubbled up" when

5

she was trying to explain to fellow jurors the reasons behind her holdout. The court expressed concerns that Juror No. 10 was "stepping into the shoes of the protective mother again," and her "feelings were getting tangled up in her deliberations." The court stressed it had no problem with Juror No. 10 holding her ground, but it feared the reason for her holdout was she "had a son in a similar situation, et cetera, et cetera."

Defense counsel "strenuously object[ed]" to the replacement of Juror No. 10, arguing Juror No. 10 was being replaced because she was the lone holdout juror. But he conceded her feelings about her son "were bubbling up as court indicated" and Juror No. 10 "[m]aybe being a protective mother." The trial court again clarified it was not excusing Juror No. 10 because she disagreed with other jurors, but because she "readily admitted that . . . this was based on feelings that bubbled up about her son."

An alternate juror was seated on the jury the next day. The jury started deliberation anew and reached guilty verdicts on the same afternoon.

B.      Analysis

A trial court may, upon good cause, discharge a juror who is unable to perform his or her duty. (§ 1089.) This includes when the court "finds that the juror's state of mind would prevent him or her from being impartial." (*People v. Ledesma* (2006) 39 Cal.4th 641, 670.)

A juror's intentional concealment of material information during voir dire constitutes juror misconduct, creating a rebuttable presumption that the misconduct was prejudicial. (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.) On the other hand, where a juror inadvertently or unintentionally failed to disclose material information during voir dire, the trial court should consider whether the juror is " ' "sufficiently biased to constitute good cause for the court to find under [section] 1089 . . . that he [or she] is unable to perform his duty." ' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644; *People v. Jackson* (1985) 168 Cal.App.3d 700, 706.) Whether a juror is sufficiently biased is " 'within the discretion of the trial court. Except where bias is clearly apparent

6

from the record, the trial judge is in the best position to assess the state of mind of a juror.' " (*San Nicolas*, at p. 644; accord, *People v. Clark* (2011) 52 Cal.4th 856, 895 ["The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses"].)

" 'We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.) "This means simply that the record must reveal the reason for the court's decision to discharge a juror and in turn substantial evidence must support that reason." (*People v. Peterson* (2020) 10 Cal.5th 409, 472-473.) But we do not reweigh the evidence and we defer to the trial court's assessments of the juror's credibility based on their firsthand observations. (*Williams*, at p. 1262.)

Here, the trial court correctly found good cause to excuse Juror No. 10. When Juror No. 10's son was threatened with a rape accusation at 18 years old, Juror No. 10 "instantly" utilized her professional knowledge and resources to help her son in case "something happens." This event, as the court observed and Juror No. 10 conceded, was "incredibly relevant" to the determination of her ability to serve on the jury in a case where another young man was accused of rape. Juror No. 10 admitted her son's incident "bubbled up" when she was trying to explain to other jurors the reasons behind her holdout—her son almost suffered a false accusation, and so could defendant. The jury foreperson also informed the court that Juror No. 10 disclosed her son's incident "provided her some personal concerns that affected her ability to consider the case impartially." These statements sharply contrasted Juror No. 10's claim that her son's situation had nothing to do with her decision in this case. We accept the trial court's determination of Juror No. 10's state of mind. (*People v. Clark, supra*, 52 Cal.4th at p. 895 [if a juror's statements are conflicting, the trial court's determination of the

7

person's state of mind is binding]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 [the evidence on a juror's bias during deliberation is often in conflict, and we defer to the trial court's factual findings based on its "firsthand observations unavailable to us on appeal"].)

This determination is further supported by the prosecutor's observation that Juror No. 10 "[c]learly heightened her voice" every time she asked about stepping aside, suggesting Juror No. 10 was emotional about her decision. (See *People v. Stewart* (2004) 33 Cal.4th 425, 451 ["a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record"].) Thus, sufficient evidence supports the trial court's conclusion that Juror No. 10 "stepp[ed] into the shoes of the protective mother" and "her feelings were getting tangled up in her deliberations," leading to her holdout. The trial court did not abuse its discretion in excusing Juror No. 10.

Because we conclude the trial court correctly found Juror No. 10's bias constituted good cause to excuse her, we need not decide whether Juror No. 10's concealment of her son's incident was intentional.

## II

### *Sufficiency of the Evidence*

Defendant argues the People failed to prove beyond a reasonable doubt two counts of digital penetration because M.D. testified at trial that defendant only digitally penetrated her once.

### A.    Additional Background

At the hospital immediately after the assault, M.D. provided a recorded statement of the incident to Deputy Sheriff William Mundy and his trainee. At trial, on August 17, 2021, Mundy testified he spent "quite a while" taking M.D.'s statement because he was training a new deputy.

8

According to Mundy, M.D. stated defendant penetrated her with his finger "a few times in two separate instances during the incident." Mundy reaffirmed this statement after reviewing the transcript of the interview. M.D. also confirmed the statement she provided to Mundy accurately described the incident, although she did not "have a perfect recollection of" every statement she gave relating to the incident. She admitted she might have forgotten some details in the statement to Mundy.

At trial, M.D. testified defendant digitally penetrated her once.

B.      Analysis

"When reviewing a challenge of the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 804.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Here, sufficient evidence supported the jury's finding. The trial took place more than three years after the assault. A witness's recollection of an incident can fade over time, and a witness might suppress the memory of such a traumatic event. As M.D. acknowledged, her statement made immediately after the sexual assault best described the incident. Thus, viewing the evidence in the light most favorable to the prosecution, we conclude sufficient evidence supports the jury's finding of two instances of digital penetration.

Defendant argues M.D.'s statement to Mundy was "less accurate" because she was "under the influence of alcohol, cocaine, and several opioid drugs at the time of the incident." Instead, defendant contends M.D.'s testimony at trial was more accurate because she was "clean and sober." But we fail to see how, if M.D.'s memory was

9

impaired at the time of the incident due to alcohol and drug use, she could regain a better, more objective recollection of the incident after the fact.

DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

BOULWARE EURIE, J.

10