Filed 11/12/21  P. v. Artale CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER JAMES ARTALE,<br><br>    Defendant and Appellant. | D076797<br><br><br><br>(Super. Ct. No. SCE374709)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed October 15, 2021 is hereby modified as follows:

On page 19, in the final sentence of the second full paragraph, the words "approximately two and a half" are deleted and the word "several" is inserted so that the sentence reads:

> The newly constituted jury reached a guilty verdict after several days of deliberations.

On page 33, in the third sentence of the second full paragraph, the words "approximately two and a half" are deleted and the word "several" is inserted so that the sentence reads:

> After the replacement juror was sworn in, the jury deliberated anew and reached a verdict after several days of deliberations.

On page 34, in the last citation in the paragraph before section II, the following additional citation is inserted: "see *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1066-1067 [reversal and remand for new trial warranted when trial court discharged potential holdout juror without conducting adequate inquiry into allegations of juror misconduct]," such that the full citation reads:

> (*Id.* at pp. 511-512 [erroneous discharge of holdout juror for allegedly failing to deliberate warrants reversal]; see *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1066-1067 [reversal and remand for new trial warranted when trial court discharged potential holdout juror without conducting adequate inquiry into allegations of juror misconduct].)

The People's petition for rehearing is denied.

There is no change in the judgment.

HALLER, Acting P. J.

Copies to:  All parties

2

Filed 10/15/21  P. v. Artale CA4/1 (unmodified opinion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076797 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE374709) |
| CHRISTOPHER JAMES ARTALE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Reversed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christopher James Artale of second degree murder with a firearm (Penal Code, §§ 187, subd. (a), 12022.5, subd. (a)) after he shot

and killed Aldo Prado.[1]  Artale claimed he shot Prado in self-defense.  The jury only reached a guilty verdict after the trial court discharged a holdout juror, Juror No. 1.  The trial court found Juror No. 1 was "not following the law," "was predisposed[,] and essentially did not participate in the jury deliberation process."  Artale contends the trial court erred by discharging the holdout juror.  We agree that, under the heightened standard of review that applies to a trial court's decision to discharge a seated juror, the trial court's decision here is not manifestly supported by evidence.  Juror No. 1's inability to render a fair and impartial verdict based on the evidence presented at trial does not appear in the record as a demonstrable reality.  Because we hold that the judgment must be reversed based on the trial court's error in discharging Juror No. 1, it is unnecessary for us to consider Artale's remaining arguments other than his challenge to the sufficiency of the evidence.  We conclude the evidence is sufficient to sustain his conviction.  Although we reverse the judgment based on the court's erroneous discharge of a sitting juror, there is no double jeopardy bar to retrial of the case.

FACTUAL AND PROCEDURAL BACKGROUND

For purposes of this section, we state the facts in the light most favorable to the judgment.  (See *People v. Coleman* (2007) 146 Cal.App.4th 1363, 1366.)

Artale testified in his own defense and stated that he and Prado met in 2015.  Artale admitted he purchased drugs, including heroin, crystal meth, and Suboxone, from Prado, and they were also friends.  Artale knew that Prado had some incidents involving violence in his past, but Artale and his wife continued to socialize with him from 2015 through 2017.

---

[1]  Further statutory citations are to the Penal Code unless otherwise indicated.

2

On October 1, 2017, Artale agreed to help Prado move out of a room he was renting from Annette G.  Annette overhead an argument between the two men after Artale arrived later than anticipated.  Prado was upset with Artale for being late, and Artale became angry because Prado was not packed.  Annette heard Artale say, " 'Fuck.  What the fuck?' " and heard Prado tell Artale, " 'Shut up' " and " 'Respect her house.' "  Annette heard Artale say, " 'Fuck this shit,' " and saw him pull away quickly in his truck.  Prado was upset after Artale left.  He apologized to Annette for Artale's behavior and drove away in his car in the same direction as Artale.

Artale claimed that Prado picked up a knife and held it about six to eight inches from his head during their argument at Annette's house.  Artale "was terrified" and did not understand why Prado was so upset.  He got into his truck and sped away.  He later saw Prado was following him.  Artale testified that Prado was yelling out the window at him and swerving, and while they were stopped at a red light, Prado threatened " 'I'm going to fuck you up.' "  At some point Artale lost sight of Prado but thought he was still following him.  Artale said he was scared, but he never called 911 or his family to alert them that Prado had pulled a knife on him or was following him.

Artale testified that, when he got home, he parked his truck at the curb in front of his house.  He walked through the security gate down the sloped driveway to the "downstairs" area of the house and retrieved a gun.  Artale's wife was in the bedroom where he retrieved the gun, but he did not tell her to call 911 or alert his parents who were in the home too.  Artale went back outside with the gun.  He left the gun on a bench in the carport, saying he "had intentions of working on [his] truck."  Artale then decided to return to the top of the driveway and saw Prado coming up the hill with a knife in his

3

hand. Artale went back down the driveway to retrieve his gun. When he turned around, Prado was there, three to five feet behind him. Artale pointed the gun at him and said, " 'Get out of here.' " Prado appeared enraged and said, " 'You're not going to shoot me.' " After Artale said " 'If you come any closer, I will,' " Prado stated "Fine," "I'm going to F your stuff up." Prado backed up and went up the driveway, and Artale followed him after briefly hesitating. Artale heard a hissing noise; as he came to the top of the driveway, he saw Prado "crouched down," "done slashing" the front tire of his truck and "getting up from the [crouching] position." Prado "took a couple big steps . . . up the hill" and stopped at the truck's rear tire. Prado bent over again and was jabbing at the rear tire. Artale told him to stop as he held his gun down in front of him. Artale testified that Prado "had his left foot in the curb and he had his right knee on the curb and when [Artale] told him to stop, that's when he—he pivoted off his right foot and came up, and he had the knife in his right hand and he came up like this [indicating] at [him]." Then Artale "raised the gun and [he] fired." Artale stated he thought Prado "was coming right at [him]," he had nowhere to go, and "was out of options." Prado "dropped." Artale testified he did not know whether Prado took any steps toward him when he fired. Artale did not attempt to render aid. He immediately went inside and called 911.[2]

An eyewitness, Jael K., saw the shooting. He had parked his car nearby and was looking for a friend's house. As Jael stood on the sidewalk looking at his phone, he was approached by a man later identified as Prado. Prado seemed "a little off" and "pissed off," and he said to Jael, " 'Tell them

---

[2]    Artale's 911 call was played for the jury. Artale told the operator he "just had to shoot somebody that pulled a knife on [him]" and asked for an ambulance.

4

that I did it.'" Prado continued walking up the hill to the north, and Jael walked southward down the hill. Jael then heard what sounded like someone puncturing a tire and air escaping. Jael turned around and saw Prado with what looked like a knife in hand kneeling or squatting by a truck, puncturing the truck's tire. Jael saw him quickly look over his right shoulder and then start running up the sidewalk, parallel to and in the direction of the back of the truck and away from the shooter. A man "pop[ped] out on the sidewalk" and "went into a shooter's stance" with his feet planted and his arms raised in front of him, parallel to the ground. The shooter emerged from an area of the bushes by the sidewalk. Jael "heard a loud bang" which he assumed was a gunshot because of the loud sound and because he saw "smoke coming from [the shooter's] hands." Jael saw the back of the shooter and could also see his arms raised because of the angle at which the shooter was standing. After he heard the loud bang and saw smoke come out, Jael saw Prado fall "off of the curb behind the truck." Jael was able to see both Prado and Artale in his field of vision and there were no obstructions of his view on the sidewalk. Jael did not see Prado slash at the shooter with a weapon.

Jael hid behind a bush and called 911. A recording of the call was played for the jury. Jael told the 911 operator that Prado was "slashing someone's tires and then a guy [Artale] came out of the house and shot [Prado], while [Prado] was trying to run away." Jael described the shooter as wearing a white shirt and blue jean shorts.[3] He said Artale shot Prado "in the back."

---

3    The day of the shooting, Artale was wearing a gray shirt with a large company logo on the back, and long pants. The clothes were subsequently shown to the jury.

At the scene, Jael told one police officer he was 70 to 80 feet from the shooter and told another officer he was 20 feet away from the shooter. When Jael met investigators at the scene for a subsequent interview, they measured the distance from where Jael said he observed the shooting and determined he was approximately 120 feet from the shooter and 145 feet from where Prado fell. Jael acknowledged he previously told a police officer that he saw Prado " 'kind of turn his back to try to run away' " before the gunshot and that Prado " 'was getting ready to run away' " when the shot occurred.

Police arrived on the scene within minutes of the shooting and provided first aid to Prado until emergency personnel arrived. Officers testified that Prado was on his back, bleeding from wounds on his forehead and the side of his head. An open box cutter lay on the ground approximately 24 inches from his body.[4]

An officer rode with Prado in the ambulance to the hospital. Prado was in a lot of pain, yelling and moaning. Prado said "his girl's ex-boyfriend" shot him and then said his name was " 'Mark Coblin.' " Prado also said his girlfriend's name was " 'Salis' " and then said, " 'He stabbed me.' " Prado said he was trying to get his money from a safe inside the house, and he said, " 'Debbie let me in.' " The officer asked Prado why he was shot, and Prado said, " 'I told him I was going to kick his ass.' " Prado was unable to provide

---

[4]    A detective described it as a "folding box cutter style knife" or a "commercial utility knife" measuring six inches, with a one-inch black or dark metal blade.

more responses.[5]  Prado underwent surgery at the hospital and died on October 3 after he was removed from life support.

Meanwhile, at the crime scene, officers collected the box cutter and a shell casing found about six or seven feet in front of Artale's truck.  Officers observed that the front passenger tire of the truck was flat; there was a one-inch cut in the tire.  Officers located Prado's car parked on an adjacent street.

Artale complied with officers' directions, identified himself as " 'the shooter,' " voluntarily accompanied officers to the police station, and made a statement to detectives before he was subsequently arrested.  Portions of Artale's statement were played for the jury.  Artale told officers he had gone to Prado's home to help him move, and Prado "started yelling at [him]" and threatened him with a fold-out utility knife.  After Artale left, he noticed Prado was following him, "yelling at [him], trying to . . . ram into [him]."  He described retrieving his firearm when he got home and said:

> "And then I didn't see him.  So I put [the gun] down on the bench, and I walked up on the hill, and I looked down—I saw him walking up the street, knife in hand.  And before I could even get down to the thing, to the—back to the bottom of the carport, he was coming at me, and so I picked up the firearm, and, and I pointed it at him.  I said stop.  This is crazy, I said, go away.  And, uh, he, uh, he, he walked back up the driveway; he slashed a tire on the tr, the green truck.  So I followed him up, I saw him do that, and I said stop it.  And he went to go to the back, I said stop.  And he turned around, back at me, and I—I fired.  That's it.  I'm pretty shook up."

---

[5]  Officers were unable to locate anyone named "Mark Coblin" and later confirmed that Prado had not been stabbed and had not entered Artale's house that day.

7

Artale told police that Prado was "probably" using "dope." But Artale falsely denied using narcotics when the police asked about his own drug use. Artale did not tell the police about any of the incidents of violence involving Prado which he testified to at trial.

The prosecution's forensic pathologist testified that Prado's autopsy revealed gunshot wound injuries to the head as well as a graze wound on his right shoulder. The autopsy indicated that, with respect to the gunshot wound of his head, the bullet entered at the bottom of Prado's right ear and exited through his forehead. The bullet traveled through Prado's brain with a slightly upward trajectory causing injuries to Prado's right frontal and temporal lobes and the basal ganglia. For the graze wound on his right shoulder, the direction was from behind the body toward the front of the body. The wounds were "consistent with having been caused by one bullet."

Toxicology reports indicated Prado had used methamphetamine, heroin, and cannabis. The methamphetamine levels were present in a concentration "within a range that's been associated with violent and irrational behavior."

The prosecution's crime scene reconstructionist determined that the evidence was consistent with a single shot being fired and consistent with the deceased moving away from the shooter at the instant of the gunshot.[6] He testified that this model was consistent with Jael's account that Prado was "towards the back of the truck and when he was struck, [or] when the

---

[6]    The expert explained that if a body was static when shot in the head, it would likely "just . . . fall down at that location," and if it was moving, it would fall "in the direction of body momentum." Here, he considered the eyewitness account placing the shooter on the portion of the sidewalk closest to the house, Prado's body's location in the street, with his shoes near the curb, and the three "defects" or wounds observed during the autopsy.

8

gunshot was heard, [and] he fell off the sidewalk and fell behind the truck." If Prado had not been moving at the time of the shot, he would expect to find the body "right at the edge of the sidewalk and the curb." He acknowledged, however, that there was a possibility that Prado was facing Artale when the decision to pull the trigger was formed and then turned prior to being shot, because "it takes [between one quarter and one third of a second] from the decision to pull the trigger, and a person can certainly change their position in that time frame."

In his defense, Artale called Prado's former psychiatrist to testify that Prado had previously been diagnosed with "possible bipolar disorder," post-traumatic stress disorder due to experiencing prior physical and emotional abuse, and polysubstance abuse, including heroin and marijuana dependency abuse. Over the course of his treatment, Prado exhibited psychosis and demonstrated poor reality testing, visual and auditory hallucinations, and extreme paranoia. Just weeks before his death, the psychiatrist wrote a letter on Prado's behalf diagnosing Prado with "a chronic psychiatric disability" and indicating that Prado continued to intermittently abuse heroin.

Artale also introduced evidence of Prado's 2007 felony conviction for assault with force likely to produce great bodily injury (§ 245, subd. (a)(1)) and misdemeanor conviction for inflicting injury on a partner (§ 273.5). In addition, the jury heard excerpts of a police interview of Prado's estranged girlfriend, Shalise G., who described being beaten by Prado in a casino parking lot approximately one month earlier and described a second altercation two weeks earlier when Prado allegedly bit her arm. Shalise told the detective that Prado "gets in this rage where he goes crazy and it's, and it's for a moment, and then he snaps out of it, and he gets all crazy, but then

9

like an hour later, he is like your best friend again.  He'll be apologizing and makes everything right."  She said "when [Prado] used to get in his rant and raves, he'd threatened to murder me, to kill me."

The defense called an independent expert to testify about reaction times, firearms and the use of force, and crime reconstruction.  The expert testified that "from a 21-foot distance at a standing start, the average adult male could close the gap and deliver a knife thrust in 1.5 seconds."  The expert testified that the average person will react to an anticipated stimulus within a quarter of a second.  However, when a stimulus is not anticipated but comes as a surprise, reaction time is generally about three times longer, or three-quarters of a second.  The expert testified that as a "rule of thumb," a quarter turn can be accomplished in a quarter second, and a half turn in a half second, so if Prado was facing Artale, it would have taken him a quarter or half a second to turn away.  Presented with a hypothetical scenario, the expert opined that if someone armed with a gun saw an assailant turn toward them with a knife and they decide to shoot, and if then the assailant suddenly, unanticipatedly, turns away, it would be "humanly impossible" to prevent the shooter from firing because the turn takes a quarter second, while the response takes three-quarters of a second.  The expert opined it was "very common" under such circumstances for a shooter to be surprised to learn they had shot someone in the back.  On cross-examination, the expert admitted that the wound path was consistent with the prosecution's theory that Prado had turned to run away when he was shot.

In closing argument, the prosecutor argued that Artale killed Prado in anger while Prado was running away and encouraged the jury to believe Jael's account over Artale's.  Defense counsel argued that Artale's testimony established that he was justified in killing Prado in self-defense.  Jael's

10

eyewitness account was "relatively unreliable" because he was inconsistent in describing what happened, inaccurate in describing the shooter's clothing, and inconsistent in describing how close or far he was from Prado and Artale at the time of the shooting.

After two days of deliberation, Juror No. 1 was discharged and replaced with an alternate juror.[7] The jury subsequently found Artale guilty of murder in the second degree and found true all four of the firearm allegations. (§§ 187, subd. (a), 12022.53, subd. (b)-(d), 12022.5, subd. (a).) After denying Artale's motions for a new trial and to reduce the judgment to involuntary manslaughter, the trial court sentenced him to 15 years to life in prison, plus 10 years for the firearm enhancement. (§ 12022.53, subd. (b).)

DISCUSSION

I.

*The Trial Court Abused Its Discretion in Discharging a Holdout Juror*

A. *Additional Background*

Prior to deliberations, the jury was instructed, "Do not use the Internet or dictionary in any way in connection with this case either on your own or as a group. Do not investigate the facts or the law or do any research regarding this case either on your own or as a group. Do not conduct any tests or experiments, visit the scene of any event involved in this case. If you happen to pass by this particular street, do not stop or investigate." (CALCRIM No. 201.)

The jury deliberated for a full day on a Thursday before being excused for the weekend. The jury resumed deliberations the following Monday at 9:00 a.m. At 2:25 p.m. that day, the foreperson submitted a note to the court

---

[7] The circumstances surrounding the discharge of Juror No. 1 are discussed in further detail *post*.

11

stating, "We have reached an impasse and need some guidance. All are in agreement except Juror [No.] 1 who openly admitted to doing an experiment on her own and doesn't appear to be following the [c]ourt instruction. There is concern that her mind was set when she walked in. We need some guidance."

With counsel present, the court noted two main issues: the impasse and potential juror misconduct. The court indicated it intended to call in the foreperson, Juror No. 9, to inquire. However, the bailiff reported that Juror No. 1 was limping and appeared to be in pain, so the court called in Juror No. 1, who reported that her "hip popped out of place" because she "sat in a chair too long," and that she had taken over-the-counter-pain medication that "hasn't done anything." When asked, she confirmed twice that she was able to continue deliberating and stated she would move and walk around to relieve the pain.

The court then called in Juror No. 9. The court confirmed with the foreperson that there was an "issue of an impasse." The court stated it did not want to talk about "the contents of the deliberations" and asked about the experiment Juror No. 1 "openly admitted to doing." Juror No. 9 responded that, "She did it on her own," and "[i]t wasn't anything major, but it concerned me because of her attitude toward reviewing and participating." With respect to the comment that "her mind was set when she walked in," Juror No. 9 stated that was based "[p]rimarily" on the juror's "attitude, and while we're all reading through documents and looking at things, she's basically not doing that and not participating a lot in discussion. It's minimal and only if I approach her . . . mostly it's me saying, 'Okay. What do you think?'" The court asked, "Does she respond?" Juror No. 9 replied, "She does, but . . . there's not really any discussion. It's just, 'This is it.' [¶] I'm

12

not saying that she's wrong in having made up her mind, and, you know, we've actually talked about that, that she has that right as a juror, but it's just her lack of what I feel would be useful review and participation in the process. I'm concerned about that."

The court then reread the following portions of the jury instructions to the entire jury:

> "CALCRIM 200, duties of judge and jury: You must decide what the facts are and it's up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial.

> "CALCRIM 201: Do not use the Internet or dictionary in any way in connection with this case either on your own or as a group. Do not investigate the facts or the law or do any research on this case either on your own or as a group. Do not conduct any tests or experiments or visit the scene of any event involved in this case. If you happen to pass by the scene, do not stop or investigate."

The court then asked the jury, by show of hands, "Does anyone feel that there are jurors who are not participating in the jury deliberation process?" Nine of the 12 jurors raised their hands in the affirmative (Juror Nos. 3, 4, 5, 7, 8, 9, 10, 11, and 12).

The court asked, "Do you believe that there are any jurors on this panel who have . . . made up his or her mind prior to the beginning of deliberations?" Nine of the 12 jurors raised their hands in the affirmative (Juror Nos. 2, 3, 4, 7, 8, 9, 10, 11, and 12).

The court then asked, "Do you have any knowledge or was there any discussion about any juror or jurors who participated in an experiment in this case?" Nine of the 12 jurors raised their hands in the affirmative (Juror Nos. 3, 4, 5, 6, 7, 8, 9, 11, and 12).

The court indicated it intended to question each juror alone, beginning with Juror No. 12. At a sidebar conference, defense counsel stated that no juror should be removed, and objected to individually questioning the jurors, stating, "what is the relevance . . . if three people feel that that juror is participating and hasn't done anything wrong?" The court proceeded to question the jurors individually.[8]

Juror No. 12 stated she believed Juror No. 1 was not following the law because "[s]he told us today that . . . over the weekend . . . she acted out something." Juror No. 12 stated that Juror No. 1 shared that information with all of the other jurors and continued, "[W]e asked her if that affected her decision and she did say no, but she's also told us today that she has a firm belief—I'm trying to say it without saying too much." The court asked, "Well, I want to know if in your opinion she's not following the law." Juror No. 12 stated she "believe[d] so," and she further "believe[d]" Juror No. 1's mind was made up prior to the beginning of the deliberations. Juror No. 12 stated she did not think the experiment "was a new type of evidence" and commented that Juror No. 1 appeared to be in "a lot of pain" that day.[9]

Juror No. 11 stated she felt Juror No. 1 was not participating in the jury deliberation process and felt she was "not following the jury instructions." Juror No. 1 had disclosed that she participated in an experiment: "she tried to do demonstrations at home." Juror No. 11 stated

---

[8]    The court did not question Juror No. 9, the foreperson who had written the note, a second time.

[9]    The court used the term "new type of evidence" first when questioning this juror. No explanation was provided on what this meant; as discussed *post*, the term is used in case law discussing whether an experiment is improper.

Juror No. 1's disclosure did not affect her (Juror No. 11's) decision-making in any way.

Juror No. 10 stated she felt Juror No. 1 was not following the law and "believe[d]" she made her mind up prior to the beginning of deliberations. She stated that Juror No. 1 disclosed she had participated in an experiment, but this did not affect her (Juror No. 10's) decision-making at all.

Juror No. 8 stated she believed that one juror—a female she could describe but could not identify by name or number—was not following the law and believed she had made up her mind prior to the commencement of deliberations. Juror No. 8 had "just heard something today about someone having performed an experiment" and was "not even positive if it was the same juror." The information about the experiment did not have an impact on Juror No. 8's deliberations. Juror No. 8 commented that this juror seemed to "not [be] listening to actually exactly what the law says about what's required to reach a verdict."

Juror No. 7 stated that she "felt" Juror No. 1 was not following the law and "appeared" to have made her mind up prior to the commencement of deliberations. Juror No. 1 had disclosed she conducted an experiment, but this disclosure did not affect Juror No. 7's decision-making. Juror No. 7 stated she thought Juror No. 1 was "just being stubborn. She painted herself into a corner, but—and then she told us about her experiment, so a combination of all those things makes me think that's just not cool."

When asked if there was "any juror in the jury who [he] believe[d] is not following the law," Juror No. 6 responded that he "followed the instructions to get to what [he] got." He stated he "couldn't tell" if there was a juror in deliberations who seemed to have made up his or her mind prior to

15

the commencement of deliberations and was unaware of any discussion about an experiment.

When Juror No. 5 was asked if he felt there was a juror who was not following "the law," he stated he felt there was a juror who was not following "[y]our instructions," but he did not know whether there was a juror who had made up his or her mind prior to the commencement of deliberations. He was aware that Juror No. 1 had done an experiment that "was mentioned" during deliberations. Juror No. 5 stated he was not concerned about Juror No. 1's conduct and explained, "I think she's just very firm in her belief, but no other concerns other than that."

Juror No. 4 stated he believed Juror No. 1 was not following the law and seemed to have made up her mind prior to the commencement of deliberations. He stated he "was told" that someone performed an experiment and was aware of "[s]ome" details of that experiment, but the experiment did not affect his decision-making. He stated, "I just feel that Juror No. 1, one, had—probably had her mind made up before we started deliberations and does not seem to be willing to follow what I believe the jury instructions were."

Juror No. 3 stated she believed Juror No. 1 was not following the law and seemed to have made up her mind prior to the commencement of deliberations. She stated Juror No. 1 "just mentioned that she—I guess her brother or father or somebody had a truck and—about the same size as the truck that was on the case and that she—." Before the juror could continue, the court interjected, "Without telling me any details, . . . she disclosed all that to the jurors?" Juror No. 3 responded in the affirmative, but stated that it did not affect her decision-making. Juror No. 3 then stated, "I don't know if it's because she's not feeling well, but I just get this vibe that it's very

16

negative. And we've all been—you know, obviously we all work hard and everything, and I just have that feeling that it's like, 'Okay. Well, whatever,' because she kind of had a negative attitude when we first started."

Juror No. 2 stated he believed Juror No. 1 was not following the law "according to the rules" and seemed to have made up her mind prior to the commencement of deliberations. He stated there was discussion about "[s]ome measurements and an experiment" conducted by Juror No. 1 but that did not affect his decision-making in any way.

The trial court then questioned Juror No. 1, asking if she had conducted any experiments over the weekend. Juror No. 1 replied she had, by herself, and that she "completely forgot about" the law prohibiting it and she "wasn't even thinking." She stated she shared that with the jury and that other jurors probably believed it was her who was not following the law. The trial court stated, "I appreciate your honesty." Juror No. 1 denied that her mind was made up prior to deliberations. She stated "that one instance"—"[t]he one about conducting experiments" was the only time she did not follow the law. The trial court thanked her for her honesty.

Defense counsel stated Artale opposed excusing the witness, arguing that Juror No. 1 was honest with the court and explained that the only instance in which she did not follow the law was with respect to the "experiment," and other jurors indicated "it wasn't significant in terms of what was done."

The trial court told the attorneys, "as soon as I heard that she had a comparable truck—I mean, that in my mind goes well beyond 'Don't conduct experiments.' She actually set one up. So I've kind of withdrawn from that original position that it was a minor versus major experiment." The court stated, "Well, the [c]ourt is going to discharge Juror No. 1. I feel that there is

17

substantial evidence to show that, with one exception where the juror didn't make up his mind one way or the other—Juror No. 6—all felt that Juror No. 1 is not following the law. They all felt that Juror No. 1 was predisposed and essentially did not participate in the jury deliberation process. And the experiment—I'm not so sure it's quote, new evidence, but it is concerning to the [c]ourt that she would even go so far as to put up a truck and do some measurements."

Defense counsel reiterated Artale's objection to excusing the juror. The court asked the clerk to randomly choose one of the three alternate jurors, and Alternate Juror No. 3 was selected to replace Juror No. 1. The court then instructed the bailiff "to advise Juror No. 1 that she is excused by the [c]ourt and to thank her for her service."

The following day, the trial court explained this was only the second time in 27 years that it had received "a jury note about potential misconduct or refusal to deliberate," and it inquired of each juror because it took the matter seriously. The court then summarized its decision to remove Juror No. 1 as follows:

> "When I excused Juror No. 1 yesterday—I'm looking at the note—I did so because I felt that she was not following the law. When I inquired globally of the jurors, with the exception of one juror who answered one question affirmatively and one did not raise his hand, when I questioned them further, it appeared that there might even have been a language problem with the manner in which I asked the question because he thought I was referring to him. But, in any event, the jury was almost unanimous on Juror No. 1 not following the law and also that her mind was made up before the commencement of deliberations.

> "I did have concerns about the experiment that was obviously conducted, and as counsel could see, I was trying to be very careful about not really talking about the deliberative process but rather the conduct of the juror, but

18

it does seem as if she conducted an experiment with a truck that was not identical but similar to the truck that was involved in this case. And as you both know, measurements and distances were very important in this trial.

"Whether or not that experiment produces new evidence as a matter of law, I don't know. It's a close call. But that would have been the third reason that the [c]ourt would show that there was basically substantial evidence that this juror was not taking her oath seriously."

The alternate juror was sworn in and the court instructed the jury to begin deliberations anew. The newly reconstituted jury reached a guilty verdict after approximately two and a half days of deliberations.

B. *Applicable Law*

"[S]ection 1089 sets forth the procedure for removing a sitting juror." (*People v. Boyette* (2002) 29 Cal.4th 381, 462.) It provides, in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." (§ 1089.) "Good cause exists to discharge a juror when the juror loses his or her ability to render a fair and impartial verdict based on the evidence presented at trial." (*People v. Barton* (2020) 56 Cal.App.5th 496, 508 (*Barton*).) " 'A juror's inability to perform his or her functions . . . must appear in the record as a "demonstrable reality" and bias may not be presumed.' " (*People v. Beeler* (1995) 9 Cal.4th 953, 975 (*Beeler*), abrogated on grounds as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

"Removing a juror is, of course, a serious matter. . . . While a trial court has broad discretion to remove a juror for cause, it should exercise that

19

discretion with great care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted (*Barnwell*).) "A court's intervention may upset the delicate balance of deliberations. The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence. This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case. The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*Allen*).) "[A] trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*Id.* at p. 75.) "The court cannot substitute the opinions of jurors for its own findings of fact." (*Ibid.*)

This court's "review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*People v. Fuiava* (2012) 53 Cal.4th 622, 711 (*Fuiava*).) " '[T]he demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as a trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror] was established.' " (*Id.* at p. 712.)

Under the demonstrable reality standard, the reviewing court "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.) In reaching that conclusion, this court considers "not just the evidence itself, but also the record of reasons the court provides." (*Ibid.*) The "heightened" and "more stringent" demonstrable reality standard "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due

process and to a fair trial by an unbiased jury." (*Id.* at p. 1052.) Indeed, the trial court's discretion to discharge a juror for cause under section 1089 "is 'bridled to the extent' [that] the juror's inability to perform his or her functions must appear in the record as a 'demonstrable reality,' and 'court[s] must not presume the worst' of a juror." (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729 (*Bowers*).) "[H]owever, even under the demonstrable reality standard the reviewing court does not reweigh the persuasive value of the evidence." (*Fuiava, supra,* 53 Cal.4th at p. 714.) Accordingly, reviewing courts must defer to the trial court's assessments of a juror's credibility "based 'on firsthand observations unavailable to us on appeal.'" (*People v. Powell* (2018) 6 Cal.5th 136, 156; *Barnwell,* at p. 1053.)

### C. *Analysis*

The trial court discharged Juror No. 1 because (1) she had conducted an experiment in violation of the court's instructions; and (2) she had prejudged the case and refused to deliberate. "In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*Barnwell, supra,* 41 Cal.4th at p. 1053.) We conclude the record here fails to support the court's decision under this heightened standard of review.

#### 1. *Violation of the Court's Instructions*

"[T]he jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court.'" (*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*); § 1126.) "A [juror's] failure to follow the court's instructions is misconduct and a basis for dismissal." (*People v. Peterson* (2020) 10 Cal.5th 409, 472 (*Peterson*); accord, *Engelman,* at p. 443.) "A juror commits misconduct if the juror conducts an independent investigation of the facts [citation], brings outside evidence into the jury room [citation], injects

21

the juror's own expertise into the deliberations [citation], or engages in an experiment that produces new evidence." (*People v. Wilson* (2008) 44 Cal.4th 758, 829.) But "[n]ot every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*People v. Collins* (2010) 49 Cal.4th 175, 249 (*Collins*); see *People v. Wismer* (2017) 10 Cal.App.5th 1328, 1336 [the same principles outlined in *Collins* apply "regardless of whether the new evidence is generated outside the courthouse or inside the jury deliberation room"].)[10]

In this case, the jury was instructed not to conduct experiments, and Juror No. 1 admitted she performed some type of experiment over the weekend and then discussed it with the jury. But the record is almost completely devoid of any meaningful inquiry regarding the substance of the experiment. (*Engelman*, *supra*, 28 Cal.4th at p. 444 [grounds for discharge must appear in the record " 'as a "demonstrable reality" ' " "after *reasonable inquiry* by the court"].) There is no clear indication what Juror No. 1 did or what she disclosed to the jury after she did it. The case law makes clear that

___

[10] The court stated it discharged Juror No. 1 for failing to "follow[] the law," apparently based on the juror performing an experiment. Other than the juror failing to deliberate and prejudging the case, the court cited no other basis for discharging the juror. We discuss these other grounds *post*, and focus on the juror's experiment in this section.

these types of details are critical to an appellate court's evaluation of allegations of juror misconduct.

In *People v. Cooper* (1979) 95 Cal.App.3d 844, 848-849 (*Cooper*), the defendant was convicted of possession of heroin for sale after a police officer saw him reach toward his waistband and throw a shiny object which turned out to be a bag containing heroin onto a lawn. The defendant filed a motion for new trial after he was convicted, alleging two incidents of juror misconduct relevant here. First, a juror "drove her car by some pedestrians and 'estimated whether or not a person seated in a moving car could make the observations testified to by the police officers' from which she 'concluded' that the officers' testimony was credible." (*Id.* at p. 852.)[11] Second, "the jurors 'reenacted' defendant's throwing of the plastic bag," further confirming the police officers' testimony. (*Ibid.*) The Court of Appeal affirmed the denial of defendant's motion for new trial on the basis that no juror misconduct occurred. (*Id.* at pp. 853-854.) The court found that the juror's estimation of distances and conclusion that the officers were credible were "mental processes" that "are in no way objectively verifiable," and the act of driving her vehicle, which could be verified, "does not constitute misconduct." (*Id.* at

---

[11]   The police officers were driving two to three miles per hour when they observed the defendant throw the object. (*Cooper*, *supra*, 95 Cal.App.3d at p. 848.)

p. 853.)[12]  With respect to the reenactment, the court stated that "experiments by the jury are prohibited only where the result is the production of 'new' evidence." (*Ibid.*)  Because one of the officers "had demonstrated the manner in which defendant had thrown the contraband," the court concluded the experiment did not result in the generation of new evidence and therefore did not constitute misconduct.  (*Id.* at p. 854; see also *Locksley v. Ungureanu* (1986) 178 Cal.App.3d 457, 461 [noting it was "not at all clear that [juror's] actions were an impermissible experiment and thus misconduct" where the juror drove his car with one eye covered to assess his vision because it "did not invade a new field but merely [was] an experiment on an issue within the evidence, to wit, the ability of a one-eyed individual to drive"].)

Similarly, in *Collins*, a juror went home and used his computer to create a diagram of the trajectory of the bullet used to shoot the victim.

---

[12]    Because *Cooper* involved a motion for new trial, it was necessary for the court to determine whether the proffered evidence could be considered pursuant to Evidence Code section 1150.  "Under Evidence Code section 1150 . . . , a court cannot consider evidence of a juror's subjective reasoning process in deciding whether to grant a new trial based on purported juror misconduct." (*Allen, supra*, 53 Cal.4th at p. 75.)  As our Supreme Court recognized in *Allen*, Evidence Code section 1150's "underlying policy provides guidance" in reviewing challenges to the trial court's discharge of a sitting juror.  (*Allen*, at p. 75.)  We therefore limit our consideration to the overt acts reflected in the testimony elicited by the court, and not the subjective reasoning process of the jurors.  (See *Collins, supra*, 49 Cal.4th at p. 250 [declining to consider "juror opinion, conclusions drawn by others about jurors' states of mind or level of understanding, and the particular significance jurors attached to the evidence at trial" because "[t]hese were improper intrusions into the subjective reasoning process of the jurors in violation of Evidence Code section 1150"].)  We do not consider any juror's statements as to whether Juror No. 1's experiment affected the jury's deliberations or decision-making.

(*Collins*, *supra*, 49 Cal.4th at pp. 237-238.)  The juror said that he " 'worked out height patterns and came up with the fact that anyone standing six feet away from another person would have to just about be standing on a stool two and a half feet high to get a downward trajectory through the back of the skull of an individual . . . .' " (*Id.* at p. 237.)  The juror explained that he had relied on trial testimony regarding the defendant's height and evidence of the victim's height obtained from the coroner's report.  (*Id.* at pp. 237, 253.)  The following day during deliberations, the juror staged a demonstration based on his diagram to support his conclusions regarding the manner of killing and the relative positions of the shooter and victim.  (*Id.* at pp. 237-239, 252.)  Our Supreme Court held this was not juror misconduct because the juror's "individual contemplation of the evidence" while separated from the other jurors did not introduce extraneous evidence into the jury deliberations.  (*Id.* at p. 256.)  "Nor did [the juror's] use of the computer to draw his diagram elevate his actions to misconduct." (*Id.* at p. 255.)  The juror used his computer only to "diagram the positions of the defendant and [the victim] in order to visualize how [the victim] suffered his particular wound."  (*Id.* at p. 252.)  It was not an improper experiment because it did not "result[] in the acquisition of any new facts" and instead "was simply his own permissible thinking about the evidence received."  (*Ibid.*; see also *Bormann v. Chevron United States* (1997) 56 Cal.App.4th 260, 263-264 [juror did not commit misconduct in preparing a written summary of her thoughts at home and bringing it into the jury room so long as "such notations are the product of the juror's own thought processes and the evidence, rather than extraneous influences"].)

By contrast, in *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1486 (*Vigil*), the Court of Appeal concluded a juror "crossed the line into

25

misconduct" by conducting an experiment at home to see how difficult it would be for a right-handed person to raise a rifle and point it out the window of a passenger seat of a vehicle. The juror performed the experiment using a broomstick, and told other members of the jury it was unlikely the defendant (who was driving) was unaware that the passenger was going to shoot because of how the rifle would have to be maneuvered before shooting out the window. (*Id.* at p. 1482.) The appellate court explained that the "distinction [between proper and improper experiments] usually turns on whether the juror's investigation stayed within the parameters of admitted evidence or created new evidence, which the injured party had no opportunity to rebut or question." (*Id.* at p. 1484.) The experiment in *Vigil* was improper because it "ignored several variables that could have skewed the results" including the characteristics of the interior of the vehicle and the height and weight of the driver and shooter. (*Id.* at p. 1486.) The juror also assumed, without evidentiary support, that the driver was right-handed. (*Ibid.*) "The result of the experiment was then reported to the deliberating jurors as if it were scientific confirmation of the juror's views on a vital issue in the case." (*Ibid.*; see also *People v. Castro* (1986) 184 Cal.App.3d 849, 852-854 [juror engaged in improper experiment by using binoculars at home to see if the officer could see what he had testified to, and then reported his finding to other jurors; there was no showing that the juror used the same type of binoculars as the officer, or that the lighting conditions and distances involved were similar to the conditions facing the officer].)

These cases demonstrate we are missing the type of information needed to conclude Juror No. 1 engaged in an improper experiment justifying the court's decision to discharge her. Juror No. 1 acknowledged she had conducted an experiment and stated she "completely forgot about" the law

26

prohibiting it and she "wasn't even thinking." She stated "that one instance"—"[t]he one about conducting experiments"—was the only time she did not follow the law. The other jurors described the experiment in very general terms: "she tried to do demonstrations at home"; "she acted out something"; she "mentioned . . . her brother or father or somebody had a truck . . . about the same size as the truck that was on the case"; and there was discussion about "[s]ome measurements and an experiment" conducted by Juror No. 1. The court concluded from these statements that Juror No. 1 "put up a truck and [did] some measurements" or "conducted an experiment with a truck that was not identical but similar to the truck that was involved in this case." In explaining why it discharged the juror, the court emphasized that "measurements and distances were very important in this trial." However, "[n]ot every jury experiment constitutes misconduct." (*Collins*, *supra*, 49 Cal.4th at p. 249.) It is not clear from the record how the truck was used (if at all), what measurements were taken (if any), or how those measurements were used (if at all). Similarly, it is not clear what "distances" (if any) were used in the experiment; the trial court mentioned the importance of "distances" in the trial, but none of the jurors said the experiment involved "distances."[13] In any event, there is no categorical prohibition on performing an experiment that involves measurements, distances, or other types of estimations so long as they are not based on extrinsic evidence. (See, e.g., *Cooper*, *supra*, 95 Cal.App.3d at pp. 852-853 [no juror misconduct occurred where juror drove her car by some pedestrians and

_____

13    As summarized *ante*, an eyewitness testified about his observations of the shooting from various distances, and the victim's location near a truck prior to the shooting. We do not know whether Juror No. 1's experiment was intended to replicate some or all aspects of this testimony, or something else entirely.

estimated whether officers driving at a slow speed could observe what they had testified to at trial]; *Collins*, at pp. 237-238 [no misconduct where juror " 'worked out height patterns' " and used his home computer to create a diagram of the trajectory of the bullet used to shoot the victim].) The trial court here did not determine whether the juror conducted an experiment that resulted in the generation of new evidence, or whether the juror shared any extrinsic evidence with other members of the jury. We cannot tell whether Juror No. 1 performed a permissible type of experiment as in *Cooper* and *Collins*, or an impermissible one as in *Vigil* and *Castro*. It is impossible to discern whether "the juror's investigation stayed within the parameters of admitted evidence or created new evidence, which the injured party had no opportunity to rebut or question." (*Vigil, supra*, 191 Cal.App.4th at p. 1484.)

We recognize the challenges facing trial courts responding to allegations of juror misconduct. As our Supreme Court explained: "A trial court made aware of . . . possible misconduct occurring during the jury's deliberations[] is placed on a course that is fraught with the risk of reversible error at each fork in the road. [Citation] The court must first decide whether the information before the court warrants any investigation into the matter. [Citation] If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory [citation], but the court also must not intrude too deeply into the jury's deliberative process in order to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations [citation]. After having completed an adequate (but not overly invasive) inquiry into the misconduct issue, the trial court must then decide whether, under section 1089, there is 'good cause' to excuse the juror at issue. The court at this final fork might err in declining to dismiss a juror

28

who should have been excused [citation] or excusing a juror who should have been retained." (*Fuiava, supra*, 53 Cal.4th 622 at pp. 710-711, fn. omitted.)

The court here was legitimately concerned with maintaining the secrecy surrounding the jury's deliberations. But "such secrecy *may* give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct." (*Engelman, supra*, 28 Cal.4th at p. 443.) Having decided it was necessary to inquire of the jurors, it was incumbent on the trial court to create a sufficient record to support its decision to discharge Juror No. 1. (*Barnwell, supra*, 41 Cal.4th at pp. 1052-1053 [decision must be supported "by a demonstrable reality"].) In the course of investigating whether good cause existed to replace Juror No. 1, the trial court could have asked what experiment she conducted—and whether she communicated what she had done to other members of the jury—without asking about the jury's thought processes. But that did not occur. Without even the most basic facts about the nature of Juror No. 1's experiment, the record here is inadequate.

We further recognize that "[i]n appropriate circumstances a trial judge may conclude, based on a juror's willful failure to follow an instruction, that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror." (*People v. Ledesma* (2006) 39 Cal.4th 641, 738; see *Fuiava, supra*, 53 Cal.4th at p. 711 [juror who understands the court's instructions but cannot follow them because of personal bias is properly discharged under section 1089, even without further inquiry into the juror's state of mind].) But the court did not make this type of finding here. It declined to determine whether the experiment constituted "new evidence," and it similarly did not find that the juror's actions cast doubt on her ability

29

to follow the court's instructions if kept on the jury.[14] (Cf. *Peterson, supra*, 10 Cal.5th at p. 473 [trial court did not abuse its discretion in discharging juror who repeatedly "had violated the instruction not to discuss the case and could not be trusted to refrain from doing so in the future"].) We cannot make implied findings here to support the court's decision. (See *People v. Henderson* (2021) 68 Cal.App.5th 709, 735 ["because a reviewing court [applying the demonstrable reality test] must consider 'the record of the reasons the trial court provides,' reviewing courts cannot imply findings the trial court did not expressly make"].) The scant evidence on this record fails to establish a demonstrable reality that Juror No. 1 was unable to render a fair and impartial verdict based on the evidence presented at trial. (*Beeler, supra*, 9 Cal.4th at p. 975; *Barton, supra*, 56 Cal.App.5th at p. 508.)

### 2. *Prejudging the Facts and Refusing to Deliberate*

A trial court properly may dismiss a juror based on the juror's "unwillingness to engage in the deliberative process." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*); see also *People v. Lomax* (2010) 49 Cal.4th 530, 589 ["A refusal to deliberate is misconduct."].) "A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged." (*People v. Alexander* (2010) 49 Cal.4th 846, 926.) On the other hand, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the

---

14 Instead, the trial court thanked Juror No. 1 for her "honesty" in acknowledging she had conducted one experiment, without ever obtaining pertinent information on what that experiment entailed.

majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Cleveland*, at p. 485.)

" 'The inquiry [into possible discharge of a juror] should focus upon the *conduct* of the jurors, rather than upon the content of the deliberations.' " (*Barnwell*, *supra*, 41 Cal.4th at p. 1054, italics added.)  But here, the trial court expressly relied on the opinions and beliefs of the jurors without making its own findings of fact based on Juror No. 1's alleged conduct.  The trial court summarily concluded that the jurors "all felt that Juror No. 1 was predisposed and essentially did not participate in the jury deliberation process," and that "the jury was almost unanimous . . . that her mind was made up before the commencement of deliberations."  As our Supreme Court has cautioned, "a trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*Allen*, *supra*, 53 Cal.4th at p. 75.)  "The court cannot substitute the opinions of jurors for its own findings of fact" regarding a juror's alleged misconduct.  (*Ibid.*)

Moreover, the record does not support the conclusion that Juror No. 1 prejudged the case or refused to participate in deliberations.  Substantial evidence in the record instead establishes that Juror No. 1 merely disagreed with other jurors about the weight of the evidence and the outcome of the case.  The allegation that Juror No. 1's "mind was set when she walked in" was only made when the jury had reached an impasse, with all in agreement except Juror No. 1.  One juror complained that Juror No. 1 had "kind of had a negative attitude when we first started," and another stated that she was "just very firm in her belief, but [had] no other concerns other than that."  Only two jurors, numbers 9 and 11, accused Juror No. 1 of not participating

31

in jury deliberations.  Juror No. 11 provided no explanation to justify that belief, and Juror No. 9, when pressed, acknowledged that Juror No. 1 was participating, just "not . . . a lot," and further acknowledged Juror No. 1 would respond to her questions, but without "really any discussion."

None of these statements is sufficient to support the court's decision to discharge Juror No. 1.  "The evidence regarding Juror No. [1's] manner of deliberating does not state a proper ground for her discharge."  (*People v. Armstrong* (2016) 1 Cal.5th 432, 453.)  Even assuming Juror No. 1 had firm beliefs, an unwillingness "to engage in further discussion, by itself, does not show as a demonstrable reality that she was failing to deliberate.  It is not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.' "  (*Armstrong*, at p. 453; see *Engelman*, *supra*, 28 Cal.4th at p. 446 ["[t]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view"].)  Juror No. 1 deliberated with the jury for nearly two days.  As the *Cleveland* court recognized, "[a] juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views."  (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)  It is apparent some jurors were frustrated by Juror No. 1's limited feedback in response to their questions, but our Supreme Court has held that grounds to discharge a juror do not exist because the juror "relies upon faulty logic or analysis" (*Cleveland*, at p. 485), or because the juror does not "deliberate well or skillfully" (*Engelman*, at p. 446).

32

"Simply because the other jurors were not satisfied with her opinion and the quality of her reasoning does not support a finding that she was refusing to deliberate." (*Barton*, *supra*, 56 Cal.App.5th at pp. 512-513.) In sum, the record here does not establish to a demonstrable reality that Juror No. 1 had prejudged the case or was refusing to continue deliberating.

### 3. *The Error Requires Reversal*

We have concluded that, applying the heightened "demonstrable reality" standard, the record does not support the trial court's decision to discharge Juror No. 1. We further conclude the error requires reversal.

We acknowledge that this is not a situation where a verdict was reached immediately after a juror was discharged and an alternate was sworn in. (See *Bowers*, *supra*, 87 Cal.App.4th at p. 736 [observing that "after less than one day of deliberation the new jury returned verdicts of guilty"]; *Barton*, *supra*, 56 Cal.App.5th at p. 516 [defendant was convicted within hours after juror was erroneously discharged for failing to deliberate and the alternate juror joined the jury].) After the replacement juror was sworn in, the jury deliberated anew and reached a verdict after approximately two and a half days of deliberations. Nonetheless, it is apparent from the record—including the foreperson's note, the reported impasse, and the jurors' responses to the court's inquiries—that the jurors were already in agreement with the exception of Juror No. 1. Removing Juror No. 1 when her lone dissenting opinion was preventing a verdict, without establishing that she was actually unable to perform her duties, constitutes prejudicial error and warrants reversal. (*Bowers*, at pp. 734-736 [discharge of holdout juror who participated in jury discussions "to some extent" was error requiring reversal under *People v. Watson* (1956) 46 Cal.2d 818, 836]; see also *Allen*, *supra*, 53 Cal.4th at p. 65 [analyzing erroneous discharge of juror under section 1089

33

as state law error, "obviat[ing] the need to decide whether [the juror's] removal also violated defendants' constitutional rights"].) The record here establishes that "had [Juror No. 1] remained on the jury, it is reasonably probable the case would have ended in a mistrial, a more favorable result for [Artale] than conviction." (*Barton,* at p. 516.) Because the court's erroneous discharge of Juror No. 1 was prejudicial, we reverse the judgment. (*Id.* at pp. 511-512 [erroneous discharge of holdout juror for allegedly failing to deliberate warrants reversal].)

## II.

### *Substantial Evidence Supports the Murder Conviction*

Artale claims insufficient evidence supports his conviction for second degree murder because the prosecution failed to prove that Artale did not act in self-defense. We disagree.

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) As a reviewing court, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence," and we do not reweigh evidence or reevaluate a witness's credibility. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

34

Second degree murder is "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) "Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied." (*Cravens*, *supra*, 53 Cal.4th at p. 507.) " 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1165.)

There are two types of self-defense under California law: "perfect" self-defense and "imperfect" self-defense. (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1198-1199.) "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*Randle*, at p. 994.) "Imperfect self-defense is the killing of another human being under the actual but *unreasonable* belief that the killer was in imminent danger of death or great bodily injury." (*People v. Booker* (2011) 51 Cal.4th 141, 182, italics added.) "A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide." (*Randle*, at p. 994.) "Imperfect self-defense is not a complete defense to a killing, but negates the malice element and reduces the offense to voluntary manslaughter. [Citations.] 'The subjective elements of [perfect] self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend . . . against imminent peril to life or great bodily injury.' "

35

(*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744; accord, *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) The prosecution has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) However, it is up to the jury to decide whether self-defense is established. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 ["It was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death."].)

There is sufficient evidence to support the jury's conclusion that Artale killed with malice. The jury reasonably could credit the testimony that Artale was angry with Prado after the two of them got into a fight at Annette's house. Artale said " 'Fuck this shit,' " and pulled away quickly in his truck. He drove home, went inside to retrieve a gun, then waited for Prado to arrive. Artale sprung out from the bushes as Prado was puncturing a tire on Artale's vehicle. Artale assumed a shooter's stance, aimed directly at Prado, and fired at him as Prado was trying to run away. This evidence supports the reasonable inference that Artale intentionally shot Prado, either with an intent to kill or with conscious disregard for life. (See *People v. Smith* (2005) 37 Cal.4th 733, 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice" and intended to kill]; *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 ["[t]he very act of firing a .22-caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill"]; see also *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263 ["The jury could have easily concluded that pointing a loaded gun at someone and pulling the

36

hammer back is an intentional act, the natural consequences of which are dangerous to human life, and that defendant deliberately did so with knowledge of such danger and with conscious disregard for [the victim's] life"].)

Artale does not deny that he shot Prado. Instead, he claims he shot Prado in self-defense: he was afraid Prado was going to attack him, he felt he "was out of options," and he only fired when he thought Prado "was coming right at [him]."[15] He highlights the victim's "extensive history of mental illness, drug addiction, and violence," reargues the inferences that can be drawn from the experts' testimony, and contends the single eyewitness's testimony was not reliable and he "could not[] speak to what was in [Artale's] mind at the moment of the shooting."[16] But the jury was not required to accept Artale's version of events or draw inferences in his favor. " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) And the testimony of a single witness is sufficient to sustain a jury's verdict, "[e]ven when there is a significant amount of

---

[15]    Artale does not specify which theory of self-defense he is relying on in his briefing. His opening brief appears to be based on perfect self-defense, and he only makes an argument about imperfect self-defense in his reply. Despite the arguable forfeiture, and because there is some overlap between the two, we exercise our discretion to address both self-defense theories.

[16]    Artale points out that the prosecution's experts could not definitively say whether Prado was facing Artale or his back was turned, and contends that Jael's testimony was subject to dispute or interpretation as there were conflicts regarding how close he was to the men, how much he could have seen, and inconsistencies in his statements. He also argues that Prado, not Artale, was enraged.

countervailing evidence" (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), as long as the testimony is not "physically impossible or inherently improbable" (*People v. Elliott* (2012) 53 Cal.4th 535, 585). In the present case, the jury reasonably could credit the eyewitness's testimony that Artale shot Prado in the back as he was running away.

The jury was presented with sufficient evidence, which it could reasonably credit, showing Artale did not act in self-defense. For perfect self-defense, Artale must have actually and reasonably believed that he was in imminent danger of death or great bodily injury. (*Randle*, *supra*, 35 Cal.4th at p. 994.) Similarly, imperfect self-defense can only be established if Artale "actually believe[d] in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) Artale's self-serving testimony that he was afraid and "out of options" is not dispositive. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 ["[W]hether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear."].) The jury heard evidence that Artale was upset with Prado over the failed move. After driving home and retrieving his gun, Artale initially aimed his weapon at Prado while in his driveway and told him to "[g]et out of here." Prado backed up and left the driveway at that point, but Artale followed him. Artale admitted he followed Prado, and then shot him after witnessing Prado puncturing his truck tire. An eyewitness testified that Prado "pop[ped] out on the sidewalk" and "went into a shooter's stance" and then shot Prado in the back while he was running

away.[17] The eyewitness further testified he never saw Prado attempt to use his knife on Artale. Artale did not tell the police that he was afraid of Prado because of his mental health issues or history of violence, as he contended at trial. Instead, he tried to minimize their relationship and lied to the police about his own drug use. Even though he claimed he was afraid because Prado was following him as he drove off after their argument, he never called 911 or informed his family of any purported risk. Based on this record, the jury could conclude that Artale's testimony lacked credibility and that he shot Prado because he was angry—not because he actually believed he was in imminent danger of death or serious bodily injury. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*) [" '[S]elf-defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker.' "].)[18] Even assuming Artale actually believed he was in imminent danger, the jury could conclude he used more force than reasonably necessary under the circumstances. (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 630 [self-defense is not available where defendant exceeds the amount of force necessary in view of the nature of the attack].) In addition to the eyewitness account, the forensic evidence was consistent with the prosecution's theory that Artale shot Prado in the back as Prado tried to run

17    Although Artale contends there were disputes as to what the witness "could or could not have seen," the court arranged for the jurors to visit the crime scene and see for themselves where the eyewitness testified he was standing when he observed the shooting.

18    In *Nguyen*, our Supreme Court cited the following standard with approval: " 'The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense.' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1045.)

away.  The medical examiner opined that the bullet grazed the top of Prado's shoulder, going "from the back towards the front of the body," and then entered Prado's head near his right ear and exited through Prado's forehead. Although Artale's expert offered an alternative theory, the expert acknowledged that the wound path was consistent with the prosecution's theory that Prado had turned to run away when Artale shot him.  When faced with the divergent accounts of what happened during the shooting, the jury could reasonably reject Artale's claim that he acted out of fear.  We do not reweigh the evidence or resolve issues of credibility on appeal.

In sum, there was substantial evidence to negate both perfect and imperfect self-defense.  The jury reasonably could conclude that no reasonable person would have believed that he was in imminent danger of death or great bodily injury, and that Artale was not acting out of actual but unreasonable fear.  Reviewing the record in the light most favorable to the judgment, we conclude substantial evidence, including physical evidence and eyewitness testimony, supports Artale's conviction for second degree murder. Because we conclude sufficient evidence supports Artale's conviction, there is no double jeopardy bar to retrial of the case (*People v. Hernandez* (2003) 30 Cal.4th 1, 6), and it is unnecessary for us to consider Artale's remaining claims on appeal.

DISPOSITION

The judgment is reversed.  The double jeopardy clauses of the California and federal Constitutions do not bar retrial of the case.


                                                            GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.

41